**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO: 24-10264-cgb** |
| | § | |
| **RIC (AUSTIN), LLC** | § | |
| | § | |
| **DEBTOR.** | § | **Chapter 11** |

### DEBTOR'S COMBINED DISCLOSURE STATEMENT AND
### SECOND AMENDED PLAN OF REORGANIZATION

This is the plan of reorganization in the Chapter 11 case of RIC (Austin), LLC. You are encouraged to carefully review the full text of this document before deciding how to vote on the Plan. You may wish to consult an attorney about your rights and your treatment under the Plan.

The source of information for this Plan is the Debtor's own books and records, historical records, public documents, testimony of witnesses, deposition testimony, and all other information relied upon by the CRO in formulating this plan.

### SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS[1]

Under the Plan, new membership interests in the Debtor shall be offered for sale pursuant to the Equity Auction. Reomaster or its affiliate shall be the Stalking Horse Purchaser (with no bid protections) with an initial bid in the amount of $5,400,000.00. The Equity Auction Proceeds shall provide for the payment of (i) Administrative Expenses, (ii) the escrow necessary to fund the repayment of the Allowed Travis County Secured Claim, (iii) one year of operating expenses of the Reorganized Debtor, (iv) funding of any proposed Plan settlements, (v) a ninety percent (90%) dividend to Class 10, and (vi) at least $100,000.00 in residual Equity Auction Proceeds which shall be distributed *pro-rata* to Allowed Unsecured Claims in Class 11. The Plan also provides for unencumbered proceeds from the Causes of Action to be paid to Class 11 *pro-rata* upon recovery.

Subject to the Adversary Proceeding, the RMLP First Lien Claim shall be an Allowed Secured Claim, Secured to the same extent, validity, priority, and enforceability as existed on the Petition Date. The RMLP First Lien Claim shall receive the same treatment as under RMLP's prepetition loan documents with an extended maturity date, and RMLP shall retain all its lien rights pursuant to the same. The remainder of the RMLP First Lien Claim shall be an Allowed Unsecured Claim, unless an election is made pursuant to section 1111(b).

The RMLP Second Lien Claim shall be an Allowed Unsecured Claim. The AFMN Third Lien Claim shall be an Unsecured Claim but will not be Allowed. The Panache Fourth Lien Claim shall be an Unsecured Claim but will not be Allowed. Allowed Unsecured Claims shall be paid *pro-rata* from the residual Equity Auction Proceeds in the amount of at least $100,000.00.

The Plan also contains several proposed settlements. Classes 6, 7, 8, and 9 contain the disputed, contingent, and unliquidated Claims of four subcontractors. The subcontractors contend

---

[1]  Capitalized terms are defined in Article 5, below.

1

that they hold Secured Claims by virtue of mechanic's and materialmen's liens for prepetition goods and services. The Debtor disputes these Claims. The Plan contains proposed settlements of the Claims in Classes 6, 7, 8, and 9. The proposed settlements consist of paying ninety percent (90%) of the undisputed amounts of such Claims, and seventy-five percent (75%) of the disputed amounts of such Claims as defined in Article 5.

## ARTICLE 1
## RELEVANT BACKGROUND AND FINANCIAL INFORMATION FOR DEBTOR

**1.1** **Nature of the Debtor's Business, History of Operations, Legal Structure and Ownership, and Events Leading to the Filing of the Bankruptcy Case.**

RIC (Austin) LLC was formed on October 6, 2020, when its Certificate of Formation of Limited Liability Company was filed with the Texas Secretary of State. The Debtor continues to be a duly organized and validly existing limited liability company organized under the laws of the State of Texas. As of the Debtor's formation, Romspen (Reomaster) Holdings Inc., a Delaware for-profit corporation, was the sole member of the Debtor. Later, Romspen (Reomaster) Holdings Inc. and Vesta Texas, LLC amended the Debtor's Operating Agreement and signed the Limited Liability Company Agreement, dated as of May 20, 2021, providing for Vesta Texas, LLC's twenty-five percent (25%) membership interest in the Debtor, and with Romspen (Reomaster) Holdings Inc. retaining a seventy-five percent (75%) membership interest in the Debtor.

The Debtor is the owner and developer of that certain 110-acre property located at 3443 Ed Bluestein Boulevard, Austin, Texas 78721, and known as the old "Motorola Campus," originally constructed in the early 1970s. Following financial difficulties and a spinoff of Motorola's semiconductor business, the Motorola Campus was largely abandoned and subsequently became the subject of a prior bankruptcy case through which the Debtor ultimately became the owner and developer of the Property.[2]

**1.2** **Events Leading to the Filing of the Debtor's Chapter 11 Case.**

During the Project, a dispute developed between the Debtor's senior secured lender, RMLP, and Panache. The disputes centered on alleged delays, cost overruns, funding and failed remediation on the Project. Eventually, Panache filed the Involuntary Petition, and an adversary proceeding, *Panache Development & Construction, Inc. v. Romspen Mortgage Limited Partnership (In re RIC (Austin), LLC)*, 24-01061-cgb (Bankr. W.D. Tex. Nov. 4, 2024) (Dkt. No. 1). RMLP's, Panache's and the other litigation parties' positions and allegations regarding these disputes may be found thereunder.

The Debtor continues to conduct maintenance, repair, management, and developmental activities and operations at and in connection with the Property. However, formal construction and renovation have ceased as a result of disputes precipitating the Involuntary Petition (defined below) to which the Debtor consented in order to establish the Bankruptcy Case as a forum to facilitate the resolution of such disputes.

---

[2] That prior case was *In re 3443 Zen Garden, LP*, Case No. 20-10410-HCM (Bankr. W.D. Tex.).

**1.3 <u>Filing of the Debtor's Chapter 11 Case.</u>**

On March 12, 2024 (the "<u>Petition Date</u>"), Panache Development and Construction, Inc. ("<u>Panache</u>") filed its *Involuntary Petition under Chapter 7*, which Panache subsequently amended on April 3, 2024 [Docket No. 5] (the "<u>Involuntary Petition</u>"). On April 29, 2024, the Debtor filed its *Answer to Involuntary Petition* [Docket No. 13] (the "<u>Answer</u>") and its *Motion to Convert Chapter 7 Case to Chapter 11* [Docket No. 14] (the "<u>Motion to Convert</u>"). On September 9, 2024 (the "<u>Relief Date</u>"), the Court entered its *Agreed Order for Relief under Subchapter V of Chapter 11 of Title 11 of the United States Code* [Docket No. 28] (the "<u>Order for Relief</u>"), granting consensual relief against Debtor under Chapter 11, subchapter V, of Title 11 of the United States Code. On and after the Relief Date, the Debtor has operated its business and managed the Property as Debtor-in-Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On February 26, 2026, the Debtor filed its *Notice of Deselection of Subchapter V Designation* [Docket No. 286] thereby converting the Bankruptcy Case from a Chapter 11, subchapter V case to one under Chapter 11.

**1.4 <u>Liquidation Analysis.</u>**

**<u>The Debtor is the source of accounting information provided, on an accrual basis, under and in connection with this Plan, with, *inter alia*, the assistance of HMP Advisory Holdings, LLC d/b/a Harney Partners, the Debtor's Bankruptcy Court approved financial advisor, and using the Debtor's books and records, information supplied by service providers and third parties, and other information compiled by the CRO.</u>**

To confirm the Plan, the Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claim and Equity Interest holders would receive in a chapter 7 liquidation. The Plan further commits the net proceeds of unencumbered Causes of Action to Class 11 further increasing the recovery of Creditors in Class 11 under the Plan.

As provided in Article 2, this Plan of Reorganization proposes to pay (i) Administrative Expenses, (ii) the escrow necessary to fund the repayment of the Allowed Travis County Secured Claim, (iii) one year of operating expenses of the Reorganized Debtor, (iv) funding of the proposed Plan settlements, (v) a ninety percent (90%) dividend to Class 10, and (vi) at least $100,000.00 in residual Equity Auction Proceeds which shall be distributed *pro-rata* to Allowed Unsecured Claims in Class 11.

In the instance where the Bankruptcy Case is converted to a Chapter 7 liquidation, the Equity Auction Proceeds would not be available to pay Creditors. Moreover, in a liquidation, the Chapter 7 trustee would be presented with an illiquid asset subject to hundreds of millions in asserted Secured Claims. The costs to preserve the Estate are approximately $200,000.00 a month which the Chapter 7 trustee could not do as there are no Estate funds. Due to acrimonious litigation among the Debtor's members and senior Secured Creditors, it is likely that the Chapter 7 trustee would abandon the Estate's assets and/or that RMLP would successfully move to lift the automatic stay and foreclose on its collateral. RMLP is significantly undersecured. RMLP also has a lien on the Debtor's personal property under the DIP Claim. Even in the event that RMLP's prepetition claims are substantially disallowed as Secured Claims pursuant to the Adversary Proceeding, the Debtor and its assets in a Chapter 7 liquidation would in such event remain subject to millions in

postpetition Secured Claims and Secured tax Claims, potentially remain subject to duly recorded mechanic's and materialmen's liens, and AFMN's alleged lien asserted in the principal amount of $13,076,004.34. A liquidation would yield a lesser recovery to all Creditors than what they will receive under this Plan. Any net proceeds from Causes of Action would be highly speculative, given the inherent risks of litigation, the need for the Chapter 7 Trustee to procure suitable contingency counsel, and uncertain collectability.

A description of the Estate's assets and their potential values can be found under the Debtor's bankruptcy Schedules A/B [Docket No. 43].[3]

An additional consideration in this analysis is the time needed to liquidate the personal property and distribute the proceeds, if not abandoned by the Chapter 7 trustee, which would result in a significant delay in making distributions to Creditors compared to the proposed timing of distributions to Allowed Claims under the Plan. Due to the lengthy administration period the Estate would require in a Chapter 7 liquidation, Creditors would not receive a distribution for months if not years. This fact, combined with the high administration costs of the Estate, mean that a recovery to Creditors would be delayed if it occurred at all. Thus, the Plan will necessarily prevent the significant risk of a much lower recovery on Claims across all Classes and will ensure a dividend to Unsecured Claims. As a result, all Creditors will receive more under the Plan than in a Chapter 7 liquidation.

If the Plan is not confirmed, it also remains possible that an alternative plan may be filed by the Debtor or another party, and ultimately confirmed by the Bankruptcy Court, and/or that an asserted secured creditor may successfully obtain relief from the automatic stay in order to foreclose on its collateral interests. The Debtor presently cannot speculate as to the terms of any such prospective, potential plan, but in the event of foreclosure it is unlikely that Creditors holding Unsecured Claims would receive any recovery on account of their Claims, in contrast to the recoveries afforded under the Plan.

**1.5 <u>Feasibility Analysis.</u>**

The Debtor must also show that it will have sufficient funding to make the required Plan payments and operate the Debtor's business. The Stalking Horse Bid shall fund (i) Administrative Expenses, (ii) the escrow necessary to fund the repayment of the Allowed Travis County Secured Claim, (iii) one year of operating expenses of the Reorganized Debtor, (iv) funding of the proposed Plan settlements, (v) a ninety percent (90%) dividend to Class 10, and (vi) at least $100,000.00 in residual Equity Auction Proceeds which shall be distributed *pro-rata* to Allowed Unsecured Claims in Class 11. With respect to the Equity Auction, as a necessary condition of establishing a prospective bidder is a Qualified Bidder, such prospective bidder must submit sufficient information to show, in the sole discretion of the CRO exercised without undue discrimination, that it has the financial ability to pursue and obtain confirmation of the Plan and perform the Plan as well as a Bid for 100% of the new membership interests to be issued under the Plan.

---

[3] Parties wishing to obtain an additional copy of such Schedules may do so by written request to the Debtor's bankruptcy counsel: Jacob J. King, Munsch Hardt Kopf & Harr, P.C.; e-mail: jking@munsch.com; Telephone: (214) 855-7598.

**1.6 Avoidable Transfers.**

The Debtor estimates that it holds Causes of Action with a face value of thirty-seven million dollars ($37,000,000.00) or more. While the Debtor cannot predict the results of prospective litigation with certainty, and any resulting success in collecting on Causes of Action, the Estate owns Causes of Action, including Avoidance Actions, against Panache, Adam Zarafshani, and other parties. These Causes of Action and Avoidance Actions are under investigation and, to the extent not asserted by the Debtor-in-Possession, will revest in the Reorganized Debtor.

## ARTICLE 2
## THE PLAN

This Plan of Reorganization under Chapter 11 of the Bankruptcy Code proposes to pay Creditors with certain Allowed Claims from the Equity Auction Proceeds. Claims are treated according to their respective Class. Claims have been classified below in accordance with section 1122 of the Bankruptcy Code.

Only Creditors in Classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A Class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a Class of Equity Interests accepts the Plan when at least two-thirds (2/3) in amount of the Allowed Equity Interest holders that actually vote, vote in favor of the Plan.

A Class that is not impaired is deemed to accept the Plan.

**2.1 Unclassified Claims.**

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any Class:

**A. Administrative Expenses**

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the holder of an Allowed Administrative Expense Claim, or Bankruptcy Court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is Allowed by the Bankruptcy Court.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

5

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Administrative Tax Claims | $ 602,810.00 | The Administrative Tax Claims shall be paid from the Equity Auction Proceeds within five (5) Business Days of Allowance.  These Claims are disputed. |
| Administrative Expense Claim of Munsch Hardt Kopf & Harr, P.C. | $ 200,000.00[4] | The Allowed Administrative Expense Claim of Munsch Hardt Kopf & Harr, P.C. shall be paid from the Equity Auction Proceeds on or before the later of: (i) as soon as practicable after the Effective Date, or (ii) within fourteen (14) days after the final Allowance of the Administrative Expenses. |
| Administrative Expense Claims of:<br><br>• HMP Advisory Holdings, LLC d/b/a Harney Partners<br>• Blackwell & Duncan, PLLC<br>• Drenner Group | $ 100,000.00<br><br>$ 5,000.00<br><br>$ 40,000.00 | The Allowed Administrative Expense Claims of HMP Advisory Holdings, LLC d/b/a Harney Partners, Blackwell & Duncan, PLLC, and Drenner Group shall be paid from the Equity Auction Proceeds on or before the later of: (i) as soon as practicable after the Effective Date, or (ii) within fourteen (14) days after the final Allowance of the Administrative Expenses. |
| Administrative Expense Claim of the Subchapter V Trustee | $ 30,000.00 | The Allowed Administrative Expense Claim of the Subchapter V Trustee shall be paid from the Equity Auction Proceeds on or before the later of: (i) as soon as practicable after the Effective Date, or (ii) within fourteen (14) days after the final Allowance of the Administrative Expenses. |
| Administrative Expense Claim of counsel for RMLP incident to the DIP Claim | $ 40,000.00 | The Allowed Administrative Expense Claim of counsel for RMLP for services provided incident to the DIP Claim shall |

---

[4]  Professional fees shall remain subject to Court approval.

6

| | | |
|---|---|---|
| | | be paid from the Equity Auction Proceeds on or before the later of: (i) as soon as practicable after the Effective Date, or (ii) within fourteen (14) days after the final Allowance of the Administrative Expenses. |
| DIP Claim | $ ~4,900,000.00 | The DIP Claim shall be an Allowed Secured Claim in an amount calculated pursuant to the relevant Final Order of the Bankruptcy Court on the Effective Date, subordinate only to the Allowed Travis County Secured Claim, and, other than the maturity date stated in the Final Order approving the DIP Claim, shall be treated the same as Class 1.  For the avoidance of doubt, the DIP Claim and its status as an Allowed Secured Claim is not subject to the Adversary Proceeding. |

**B.  Priority Tax Claims.**

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding five (5) years from the order of relief.

Each holder of a Priority Tax Claim will be paid as set forth in the chart below:

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| None | | | |

**2.2 <u>Classes of Claims and Equity Interests.</u>**

Notwithstanding the treatment of Claims under this Plan, the parties to the Adversary Proceeding, their prepetition rights and Claims against the Debtor and the corresponding treatment of such rights and Claims under this Plan remain entirely subject to the Adversary Proceeding, any subsequent final, unappealable judgment or other resolution thereof, and any relief afforded by the Bankruptcy Court through such final resolution.  The Debtor has filed and proposed the treatment of Claims and Interests under this Plan consistent with the Debtor's understanding of the capital and debt structure upon exit of the last bankruptcy case, as of the Petition Date, and in light of existing intercreditor terms and agreements between RMLP and subordinated secured creditors. Notwithstanding, in light of the foregoing, any final resolution of the Adversary Proceeding may give rise to additional legal process in order to conform the rights preserved and afforded under

this Plan to such resolution.

The following are the Classes of Claims set forth in the Plan, and the proposed treatment that they will receive under the Plan:

**A. Classes of Secured Claims**

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent Allowed as Secured Claims under section 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Secured Claim, the deficiency will be classified as an Unsecured Claim.

The Classes containing the Debtor's prepetition Secured Claims and their proposed treatment under the Plan are as follows:

Class 1: RMLP First Lien Claim

a. Identification of Class. Class 1 consists of the RMLP First Lien Claim.

b. Allowance. Subject to the Adversary Proceeding, as and if appropriate, the RMLP First Lien Claim is Allowed in the amount of $114,185,038.21, consisting of a Secured Claim in the amount of $34,500,000.00 less the DIP Claim and the Allowed Travis County Secured Claim, or as otherwise determined by the Bankruptcy Court at the Confirmation Hearing, and a deficiency Unsecured Claim in the amount of the RMLP First Lien Claim less the Allowed Secured portion of the Claim.

c. Security. Subject to the Adversary Proceeding, and subordinate only to the Allowed Travis County Secured Claim and the DIP Claim, the RMLP First Lien Claim shall be Secured by a first position lien against all the collateral securing the RMLP First Lien Claim to the same extent, validity, priority, and enforceability as such lien existed on the Petition Date.

d. Treatment. Subject to the Adversary Proceeding, the RMLP First Lien Secured Claim shall be paid in full by the Reorganized Debtor under the same terms and conditions as the promissory note forming the basis of the RMLP First Lien Secured Claim, other than the maturity date thereunder, which shall be modified and amended to December 31, 2028. Any deficiency shall be treated as an Unsecured Claim. For the avoidance of doubt, nothing in this Plan shall modify the maturity date of the DIP Claim as set forth in the relevant Final Order.

e. Impairment. Class 1 is impaired.

Class 2: RMLP Second Lien Claim

a. Identification of Class. Class 2 consists of the RMLP Second Lien Claim.

b. Allowance. Subject to the Adversary Proceeding, the RMLP Second Lien Claim is Allowed in the amount of $99,665,917.44.

c. <u>Treatment</u>.  Subject to the Adversary Proceeding, the RMLP Second Lien Claim shall be treated as an Unsecured Claim.

d. <u>Impairment</u>.  Class 2 is impaired.

Class 3: AFMN Third Lien Claim

a. <u>Identification of Class</u>.  Class 3 consists of the AFMN Third Lien Claim.

b. <u>No Allowance</u>.  Nothing in this Plan Allows the AFMN Third Lien Claim.  The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan.

c. <u>Treatment</u>.  To the extent later Allowed, the AFMN Third Lien Claim shall be treated as an Unsecured Claim.

d. <u>Impairment</u>.  Class 3 is impaired.

Class 4: Panache Fourth Lien Claim

a. <u>Identification of Class</u>.  Class 4 consists of the Panache Fourth Lien Claim.

b. <u>No Allowance</u>.  Nothing in this Plan allows the Panache Fourth Lien Claim.  The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan.

c. <u>Treatment</u>.  To the extent later Allowed, the Panache Fourth Lien Claim shall be treated as an Unsecured Claim.

d. <u>Impairment</u>.  Class 4 is impaired.

Class 5: Travis County Secured Claim

a. <u>Identification of Class</u>.  Class 5 consists of the Travis County Secured Claim.

b. <u>Partial Allowance</u>.  The Travis County Secured Claim is Allowed in the amount of $64,934.04, plus any additional amount finally determined to be valid pursuant to or in connection with the dispute between the Debtor and Travis County, whether consensual or otherwise.

c. <u>Security</u>.  The Travis County Secured Claim shall be Secured by a first priority lien against the Debtor's real property located in Travis County but only to the extent Allowed by Final Order.

d. <u>Treatment</u>.  The Allowed Travis County Secured Claim shall be paid by the Reorganized Debtor's funding into escrow of quarterly, equal installments of the entire asserted amount, with statutory interest, beginning on the Effective Date and

9

calculated through September 30, 2029, until the end of the calendar quarter following the final and unappealable resolution of the disputed portion ("Segregated Funds").  Once the total amount of the Travis County Secured Claim is so resolved, the Debtor shall begin making installment payments to Travis County beginning in the first calendar quarter following such resolution. Installment payments to Travis County shall first be made from Segregated Funds, may be monthly or quarterly, and may be paid at any time during the applicable month or quarter, in the Reorganized Debtor's sole discretion, provided however that the principal amount of each payment is calculated (on a monthly and/or quarterly basis) to pay Travis County in full by September 30, 2029 assuming that the principal amount of such monthly or quarterly installments remains equal, and provided further that under each installment, the Debtor shall include unpaid statutory interest accrued through the date of payment of each such installment. The Debtor shall complete payment of the Allowed Travis County Secured Claim, in full, with statutory interest, by no later than September 30, 2029, provided however that, following the final and unappealable resolution of the Debtor's or Reorganized Debtor's dispute, as the case may be, of the Travis County Secured Claim and to the extent that the balance of the Segregated Funds exceeds the outstanding balance thereof, the Reorganized Debtor shall use such excess funds to pay down any other due and owing ad valorem tax obligations outstanding to Travis County, and shall be free to use any remaining excess thereafter for any other purposes contemplated under this Plan.

e.  Impairment. Class 5 is impaired.

Class 6: ACM Secured Claim

a.  Identification of Class.  Class 6 consists of the ACM Secured Claim.

b.  No Allowance.  Nothing in this Plan Allows the ACM Secured Claim, save-and-except for the election of subsection (d).  The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan.

c.  Treatment.  Unless Class 6 affirmatively elects treatment under subsection (d) below by so marking its Ballot and accepting the Plan, all rights of Class 6 and the Debtor and Reorganized Debtor regarding the allowance of the ACM Secured Claim, including *in personam* and *in rem*, and including with respect to any validity, extent, priority, and enforceability of any lien securing the ACM Secured Claim, and including with respect to any setoff or counterclaim, and including with respect to any claim or counterclaim for attorney's fees and interest up to the Effective Date, are preserved and, if contested, shall be tried through such proceeding and before such venue as is otherwise appropriate to a Final Order; *provided, however,* that any such Claim and lien as Allowed shall be paid in accordance with the Plan.

d. <u>Optional Allowance and Treatment</u>.  If Class 6 affirmatively elects this optional treatment on its Ballot and accepts the Plan, then, in full and final satisfaction of the ACM Secured Claim against the Estate, as well as in mutual release of any other Claims, Causes of Action, or Avoidance Actions ACM and the Debtor may have against one another, on the Effective Date: (i) the ACM Undisputed Secured Claim shall be Allowed in full, and ACM shall receive, on account of such Allowed Claim, a distribution in the amount of ninety percent (90%) of the ACM Undisputed Secured Claim, and (ii) the ACM Disputed Secured Claim shall be Allowed in full, and ACM shall receive a distribution, on account of such Allowed Claim, in the amount of seventy-five percent (75%) of such Allowed Claim, in full and final satisfaction of such Allowed Claim.  To the extent Class 6 does not elect into the proposed settlement offered under this subsection (d) , the Debtor shall be permitted to use the funds allocated for the payment of said proposed settlements for any other purpose under this Plan.

e. <u>Impairment</u>.  Class 6 is impaired.

<u>Class 7: Austin CG Secured Claim</u>

a. <u>Identification of Class</u>. Class 7 consists of the Austin CG Secured Claim.

b. <u>No Allowance</u>.  Nothing in this Plan Allows the Austin CG Secured Claim, save-and-except for the election of subsection (d).  The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan.

c. <u>Treatment</u>.  Unless Class 7 affirmatively elects treatment under subsection (d) below by so marking its Ballot and accepting the Plan, all rights of Class 7 and the Debtor and Reorganized Debtor regarding the Allowance of the Austin CG Secured Claim, including *in personam* and *in rem*, and including with respect to any validity, extent, priority, and enforceability of any lien securing the Austin CG Secured Claim, and including with respect to any setoff or counterclaim, and including with respect to any claim or counterclaim for attorney's fees and interest up to the Effective Date, are preserved and, if contested, shall be tried through such proceeding and before such venue as is otherwise appropriate to a Final Order; *provided, however,* that any such Claim and lien as Allowed shall be paid in accordance with the Plan.

d. <u>Optional Allowance and Treatment</u>.  If Class 7 affirmatively elects this optional treatment on its Ballot and accepts the Plan, then, in full and final satisfaction of any Claim of Austin CG against the Estate, as well as in mutual release of any other Claims, Causes of Action, or Avoidance Actions Austin CG and the Debtor may have against one another, on the Effective Date: (i) the Austin CG Undisputed Secured Claim shall be Allowed in full, and Austin CG shall receive on account of such Allowed Claim a distribution in the amount of ninety percent (90%) of the Austin CG Undisputed Secured Claim, and (ii) the Austin CG Disputed Secured Claim shall be Allowed in full, and Austin CG shall receive a distribution, on

11

account of such Allowed Claim, in the amount of seventy-five percent (75%) of such Allowed Claim, in full and final satisfaction of such Allowed Claim. To the extent Class 7 does not elect into the proposed settlement offered under this subsection (d), the Debtor shall be permitted to use the funds allocated for the payment of said proposed settlements for any other purpose under this Plan.

e. Impairment. Class 7 is impaired.

Class 8: Summer Legacy Secured Claim

a. Identification of Class. Class 8 consists of the Summer Legacy Secured Claim.

b. No Allowance. Nothing in this Plan Allows the Summer Legacy Secured Claim, save-and-except for the election of subsection (d). The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan.

c. Treatment. Unless Class 8 affirmatively elects treatment under subsection (d) below by so marking its Ballot and accepting the Plan, all rights of Class 8, the Debtor, and the Reorganized Debtor regarding the Allowance of the Summer Legacy Secured Claim, including *in personam* and *in rem*, and including with respect to any validity, extent, priority, and enforceability of any lien securing the Summer Legacy Secured Claim, and including with respect to any setoff or counterclaim, and including with respect to any claim or counterclaim for attorney's fees and interest up to the Effective Date, are preserved and, if contested, shall be tried through such proceeding and before such venue as is otherwise appropriate to a Final Order; *provided, however,* that any such Claim and lien as Allowed shall be paid in accordance with the Plan.

d. Optional Allowance and Treatment. If Class 8 affirmatively elects this optional treatment on its Ballot and accepts the Plan, then, in full and final satisfaction of the Summer Legacy Secured Claim against the Estate, as well as in mutual release of any other Claims, Causes of Action, or Avoidance Actions Summer Legacy and the Debtor may have against one another, on the Effective Date: (i) the Summer Legacy Undisputed Secured Claim shall be Allowed in full, and Summer Legacy shall receive, on account of such Allowed Claim, a distribution in the amount of ninety percent (90%) of the Summer Legacy Undisputed Secured Claim, and (ii) the Summer Legacy Disputed Secured Claim shall be Allowed in full, and Summer Legacy shall receive a distribution, on account of such Allowed Claim, in the amount of seventy-five percent (75%) of such Allowed Claim, in full and final satisfaction of such Allowed Claim. To the extent Class 8 does not elect into the proposed settlement offered under this subsection (d) , the Debtor shall be permitted to use the funds allocated for the payment of said proposed settlements for any other purpose under this Plan.

e. Impairment. Class 8 is impaired.

12

Class 9: Texas Air Secured Claim

a. <u>Identification of Class</u>. Class 9 consists of the Texas Air Secured Claim.

b. <u>No Allowance</u>. Nothing in this Plan Allows the Texas Air Secured Claim, save-and-except for the election of subsection (d). The Debtor reserves all rights to object to or otherwise contest the same, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan.

c. <u>Treatment</u>. Unless Class 9 affirmatively elects treatment under subsection (d) below by so marking its Ballot and accepting the Plan, all rights of Class 9, the Debtor, and the Reorganized Debtor regarding the Allowance of the Texas Air Secured Claim, including *in personam* and *in rem*, and including with respect to any validity, extent, priority, and enforceability of any lien securing the Texas Air Secured Claim, and including with respect to any setoff or counterclaim, and including with respect to any Claim or counterclaim for attorney's fees and interest up to the Effective Date, are preserved and, if contested, shall be tried through such proceeding and before such venue as is otherwise appropriate to a Final Order; *provided, however*, that any such Claim and lien as Allowed shall be paid in accordance with the Plan.

d. <u>Optional Allowance and Treatment</u>. If Class 9 affirmatively elects this optional treatment on its Ballot and accepts the Plan, then, in full and final satisfaction of the Texas Air Secured Claim against the Estate, as well as in mutual release of any other Claims, Causes of Action, or Avoidance Actions Texas Air and the Debtor may have against one another, on the Effective Date: (i) the Texas Air Secured Claim shall be Allowed in the amount of $71,470.71, and Texas Air shall receive on account of such Claim a distribution in the amount of ninety percent (90%) of the Texas Air Secured Claim. To the extent Class 9 does not elect into the proposed settlement offered under this subsection (d) , the Debtor shall be permitted to use the funds allocated for the payment of said proposed settlements for any other purpose under this Plan.

e. <u>Impairment</u>. Class 9 is impaired.

## B. Classes of Priority Unsecured Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in Classes. The Bankruptcy Code requires that each holder of such a Claim receive Cash as soon as practicable on or after the Effective Date of the Plan equal to the Allowed amount of such Claim. However, a Class of holders of such Claims may vote to accept different treatment.

The following chart lists all Classes containing Claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| None    |             |            |           |

13

## C. Classes of Unsecured Claims

Unsecured Claims are not Secured by property of the Estate and are not entitled to priority under 11 U.S.C. § 507(a).

Class 10: Administrative Convenience Creditors

    a. Identification of Class. Class 10 consists of Unsecured Claims of less than $25,000.00.

    b. Allowance. Claims in Class 10 are Allowed in the amounts as filed.

    c. Treatment. Holders of Class 10 Claims shall be paid ninety percent (90%) of the Allowed amount of each Claim by the Debtor within five (5) Business Days of the Effective Date of the Plan.

    d. Impairment. Class 10 is impaired.

Class 11: General Unsecured Claims

    a. Identification of Class. Class 11 consists of Unsecured Claims which are equal to or exceed $25,000.00 in amount.

    b. No Allowance. Nothing in this Plan Allows any Unsecured Claim, unless expressly provided otherwise.

    c. Treatment. Class 11 Claims shall be paid *pro-rata* from the residual Equity Auction Proceeds which shall be at least $100,000.00, as well as any net proceeds of unencumbered Causes of Action, if any. The Debtor reserves all rights to object to or otherwise contest any Unsecured Claim, including on account of any counterclaim, and all such rights are transferred to the Reorganized Debtor under this Plan.

    d. Impairment. Class 11 is impaired.

## D. Class of Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a limited liability company, the Equity Interest holders are the members.

All Equity Interests in the Debtor are reaffirmed subject to any ongoing litigation.

Class 12: Equity Interests

    a. Identification of Class. Class 12 consists of Equity Interests.

    b. No Allowance. Nothing in this Plan Allows any Equity Interests.

    c. Treatment. Upon Closing, all Equity Interests in the Debtor shall be cancelled and shall receive or retain nothing under this Plan. New Equity Interests shall be issued

14

pursuant to section 2.5.5 of this Plan.

d. Impairment. Class 12 is impaired and deemed to reject the Plan.

## 2.3 Claims Allowance Process.

2.3.1 Allowance of Claims Generally.

Any Claim detailed on the Debtor's schedules for which the Debtor did not select disputed, unliquidated, or contingent is deemed an Allowed Claim under this Plan unless otherwise paid. For all other Claims, the Creditor must file a proof of Claim by the Claims Bar Date to receive a distribution under the Plan.

The Debtor may object to the amount or validity of any Claim within sixty (60) days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim (the "Claims Objection Deadline"), or within such longer period as the Bankruptcy Court may order. The Claim objected to will be treated as a Disputed Claim under the Plan.

No partial distributions will be made with respect to a Disputed Claim until the resolution of such dispute by settlement or Final Order. The provisions of this section are not intended to restrict payment of any Allowed Claims which are not disputed unless a *pro-rata* distribution is impracticable under the terms of the Plan. Until a Disputed Claim is resolved, payment distributions to claimants holding Disputed Claims will be retained by the Disbursing Agent subject to a final resolution of the Disputed Claim. Upon resolution in favor of the Allowed Claim the Disbursing Agent will distribute withheld funds within the next payment period. If the Disputed Claim is disallowed, the Disbursing Agent will make withheld funds available to Allowed Claim holders within the next payment period in accordance with this Plan. For the avoidance of doubt, the Reorganized Debtor does not need to seek Bankruptcy Court approval to settle any Disputed Claim after the Effective Date.

2.3.2 Allowance of Administrative Expenses. All final requests for the payment of Administrative Expenses must be filed no later than forty-five (45) days after the Effective Date. After notice and hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the Allowed amounts of such Administrative Expenses shall be determined by the Bankruptcy Court and then paid by the Reorganized Debtor.

## 2.4 Treatment of Executory Contracts and Unexpired Leases.

The Debtor assumes, and if applicable assigns, the following executory contracts and unexpired leases as of the Effective Date:

- Austin Porta Potty Rentals;
- Pro-Vigil, Inc.
- Ranger Security Agency, LLC
- Texas Disposal Systems, Inc.
- The Bug Master

- The Montgomery Design Consultancy

Except for the executory contracts and unexpired leases that have been assumed, and if applicable assigned, herein, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the Effective Date.

**A proof of Claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the Confirmation Date.**

Any Claim based on the rejection of an executory contract or unexpired lease under this section will be barred if the proof of Claim is not timely filed, unless the Bankruptcy Court orders otherwise.

**2.5 <u>Means for Implementation of the Plan.</u>**

2.5.1  <u>Plan Funding</u>.  The Debtor shall conduct the Equity Auction to issue new membership interests in the Reorganized Debtor as described in section 2.5.2 in exchange for the Equity Auction Proceeds.

2.5.2  <u>Equity Auction</u>

2.5.2.1 <u>Identity of the Equity Purchaser</u>.  Unless a different Qualified Bidder prevails at the Equity Auction for a different amount of Equity Auction Proceeds, the Equity Purchaser is the Stalking Horse Purchaser.  If a Qualified Bidder appears and participates in the Equity Auction, then the Equity Purchaser shall be the Successful Bidder at the Equity Auction.

2.5.2.2 <u>Equity Auction</u>.  At **1:00 p.m. (prevailing central time)** on **April 2, 2026**, an auction led by the  CRO shall be held virtually and at the offices of Munsch Hardt Kopf & Harr, P.C., in Austin, Texas, for the purpose of auctioning and selling one hundred percent (100%) of the membership interests to be issued under this Plan, subject to all other terms and conditions of this Plan, to the Successful Bidder in exchange for the Equity Auction Proceeds.  The CRO, in his sole and reasonable discretion, may adjourn or continue the Equity Auction by providing notice to the Stalking Horse Purchaser and Qualified Bidders, if any.  If the CRO adjourns the Equity Auction the CRO shall file notice of the same with the Bankruptcy Court and identify the next date on which the Equity Auction shall be held.  The Equity Auction shall be cancelled and will not be held, without further notice, if no Qualified Bidder submits a Qualified Bid by the applicable deadline.

2.5.2.3 <u>Stalking Horse Bid</u>.  The Stalking Horse Purchaser shall be Reomaster or its affiliate.  The "<u>Stalking Horse Bid</u>" consists of $5,400,000.00 in Cash.  If no Qualified Bidder submits a Qualified Bid and appears at the Equity Auction, then the Equity Auction shall conclude, and the Stalking Horse Purchaser shall be declared the Successful Bidder with a Bid in the amount of the Stalking Horse Bid.  There shall be no break-up fee, expense reimbursement, or other consideration or payment to the Stalking Horse Purchaser for serving as such.

2.5.2.4 <u>Due Diligence</u>. The CRO has established a virtual data room into which the Debtor has and shall place documents, pleadings, financial information, financial projections, and such other reasonable information as a person interested in becoming a

Qualified Bidder may reasonably expect for the purpose of performing due diligence with respect to participating in the Equity Auction. Any person may gain access to said virtual data room by: (i) executing a reasonable and customary non-disclosure agreement; and (ii) identifying in writing who the person is or who the person represents and, in the event the person is an artificial entity or represents an artificial entity, the identity of the owners of such artificial entity, all reasonably sufficient in detail to enable the Debtor to determine the ultimate owner or controller of the person or entity.

2.5.2.5 Qualified Bidders. To become a "Qualified Bidder", a person must, no later than **March 27, 2026**, submit a Qualified Bid. A Bid is a "Qualified Bid" if it: (i) demonstrates to the Debtor the financial wherewithal, in the sole discretion of the CRO, without undue discrimination, to close on the Equity Auction Proceeds as provided for in the Plan; (ii) tenders a Cash deposit, via wire transfer, in the amount of $500,000.00, which deposit shall be fully refundable except in the event that the Plan is confirmed and the Effective Date fails to occur as provided for in the Plan because the person tendering said deposit fails to close its court-approved transaction and pay over the Equity Auction Proceeds pursuant to the Successful Bid by no later than the Outside Closing Date; (iii) agrees to appear at the Confirmation Hearing and to provide such information and testimony, subject to its rights and privileges, as may be lawfully elicited from such person; (iv) submits an irrevocable Bid for Cash consideration of at least $100,000.00 more than the Stalking Horse Bid in the form of an executed purchase agreement with a redline of the form in the data room, which shall also include a commitment to close the transaction by the Outside Closing Date and shall not be conditioned on the occurrence of any event other than Bankruptcy Court approval of this Plan; and (v) submits a Bid for one-hundred percent (100%) of the new membership interests to be issued through the Plan. For the avoidance of doubt, the Stalking Horse Purchaser must comply with all procedures contained herein except for the requirements in sections 2.5.2.5(ii), (iv), and (v). The CRO shall, in his sole discretion and without undue discrimination, determine whether a Bid constitutes a Qualified Bid. In the event that the Successful Bidder fails to close its court-approved transaction by no later than the Outside Closing Date, its deposit shall be entirely forfeited and retained by the Debtor / Reorganized Debtor, unless the Bankruptcy Court determines that such timely closing was prevented by *force majeure.*

2.5.2.6 Participation in Auction. The CRO, together with the Debtor's legal counsel, shall examine any information provided pursuant to section 2.5.2.5. No later than noon on **March 30, 2026**, the CRO shall: (i) inform the Stalking Horse Purchaser and all Qualified Bidders whether there are Qualified Bids and therefore whether the Equity Auction shall take place; and (ii) with respect to any person who the CRO has rejected as a Qualified Bidder, inform that person in writing of such determination and the reason(s) for that determination. Only Qualified Bidders and the Stalking Horse Purchaser may Bid at the Equity Auction. The Debtor reserves the right to limit attendance at the Equity Auction. The Equity Auction shall be open such that each Qualified Bidder and the Stalking Horse Purchaser will know what the then-highest and best Bid is. The CRO shall open the Equity Auction by announcing to the participants the current highest and best Qualified Bid and shall inquire whether the Stalking Horse Purchaser or any other Qualified Bidder wishes to Bid. The Equity Auction shall then proceed, with the CRO, with respect to each Bid, making the determination in his reasonable judgment, as to what

the highest and best Bid is, until, in his determination, there is no higher or better Bid, at which point the CRO shall conclude the Equity Auction. The minimum bidding increments at the Equity Auction shall be $100,000.00, or as otherwise determined in the sole and reasonable discretion of the CRO for the duration of the Equity Auction.

2.5.2.7 <u>Consultation Parties</u>. The CRO shall conduct the Equity Auction, consider Bids, determine Qualified Bids, and select a Successful Bidder.

2.5.2.8 <u>Successful Bidder</u>. The CRO shall identify the Successful Bidder at the conclusion of the Equity Auction, which may be adjourned to a later date, and no later than twenty-four (24) hours after the conclusion of the Equity Auction, shall file with the Bankruptcy Court a notice sufficient to identify the Successful Bidder and the details of the Successful Bid. Should any other Qualified Bidder wish to serve as a backup bidder if the Successful Bidder fails to close on its bid, such Qualified Bidder may inform the CRO in which case the CRO shall include such information in the notice of Successful Bidder if informed prior to the filing of such notice with the Bankruptcy Court. Other than the deposit of the Successful Bidder and any backup bidder, all other deposits shall be immediately returned. Closing must occur no later than the Outside Closing Date; otherwise, any deposits are voided, and the results of the Equity Auction shall be null and void.

2.5.2.9 <u>Reasonableness of Auction</u>. The Equity Auction has not been preapproved by the Bankruptcy Court and all issues regarding the same shall be determined at the Confirmation Hearing as is otherwise appropriate.

2.5.3 <u>General Settlement of Claims and Interests</u>. Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claim, interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtor and its Estate.

2.5.4 <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>. The Debtor and the Reorganized Debtor expressly reserve all Causes of Action not released hereunder for later prosecution by the Reorganized Debtor (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or which may rise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or fact or circumstances that may change or be different from those the Debtor now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, resulting from, or after the confirmation or consummation of this Plan or the Confirmation Order, except in each case where Causes of Action or Claims have expressly been waived, relinquished, released, compromised, or settled in this Plan

or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Reorganized Debtor reserves the right to pursue or adopt any Causes of Action alleged in any lawsuit in which the Debtor is a plaintiff, defendant, or interested party, against any person, including, without limitation, the plaintiffs or co-defendants in such lawsuits. In furtherance of the foregoing, and including all Causes of Action, unless otherwise provided for in the Plan, the Debtor hereby specifically retains the following Causes of Action which shall vest in the Reorganized Debtor on the Effective Date:

2.5.4.1 All Avoidance Actions and Causes of Action against Panache, Adam Zarafshani, ACM Services, LLC, AFMN, Vesta Texas, LLC, Austin CG, Texas Air, Summer Legacy, and any other person or entity which received money from the Debtor.

2.5.4.2 No amounts paid or payable to Panache, Adam Zarafshani, ACM Services, LLC, AFMN, Vesta Texas, LLC, Austin CG, Texas Air Industries, Inc., Summer Legacy, and any other person or entity which received money from the Debtor pursuant to this Plan, any other provision of this Plan, or any application of res judicata or other claim doctrine of preclusion based on the confirmation or performance of this Plan, shall be deemed to adversely impact the viability or amount of any such Causes of Action.

2.5.5    Issuance of New Membership Interests.

2.5.5.1 On the Effective Date, the Successful Bidder will be deemed the owner of one hundred percent (100%) of the new membership interests in the Reorganized Debtor. The Reorganized Debtor may, but is not required to, issue certificates to the Successful Bidder evidencing the new membership interests. The Debtor and Reorganized Debtor may make whatever filings deemed necessary with the Texas Secretary of State and any other appropriate governmental authorities to evidence the change in ownership and issuance of the new membership interests in the Reorganized Debtor.

2.5.5.2 On the Effective Date, the limited liability company agreement and other governing documents of the Debtor will be null and void and of no further force or effect. The Reorganized Debtor will enter into a new limited liability company agreement with the Successful Bidder.

2.5.5.3 On and after the Effective Date, the Reorganized Debtor is authorized to issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, in the name of and on behalf of the Debtor or Reorganized Debtor, without the need for any approvals, authorization, or consents except for those expressly required under the Plan.

2.5.5.4 The cancellation of the Debtor's Equity Interests, Equity Auction, and purchase of the new membership interests to be issued under this Plan are contingent upon the Bankruptcy Court's approval of the Plan, and if the Plan is not confirmed by the Bankruptcy Court at the Confirmation Hearing, then the Equity Auction shall have no effect.

2.5.6 Res Judicata. The res judicata effect of the Plan or Reorganization shall not apply to the Causes of Action or Avoidance Actions of the Debtor, and all such Causes of Action and

Avoidance Actions are hereby preserved for later prosecution and shall vest in the Reorganized Debtor on the Effective Date.

**2.6 <u>Payments by Disbursing Agent.</u>**

Payments to Creditors provided for in the Plan will be made by the Reorganized Debtor.

**2.7 <u>Post-Confirmation Management.</u>**

The post-Confirmation Date officers/managers of the Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
|------|----------|--------------|
| Gregory Milligan | CRO | The CRO shall be compensated as provided in the *Order Authorizing Debtor to (A) Employ and Retain HMP Advisory Holdings, LLC d/b/a Harney Partners to Provide the Debtor a Chief Restructuring Officer and Additional Personnel, and (B) Designate Gregory S. Milligan as the Chief Restructuring Officer* [Docket No. 90] |

On the Effective Date, the Successful Bidder, after consummation of the transactions contemplated in this Plan, shall have the right to select new managers and officers of the Reorganized Debtor.

**2.8 <u>Tax Consequences of the Plan.</u>**

*Creditors and Equity Interest holders concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.*

**2.9 <u>Preconditions to the Effective Date</u>.**

2.9.1 <u>Closing</u>. It is a precondition to the Effective Date that Closing shall have occurred. If Closing has not occurred by the Outside Closing Date, any backup bidder shall have five (5) Business Days to effect Closing of its proposed transaction. If no Closing occurs by the 20th Business Day after the entry of the Confirmation Order, the Plan shall be null and void.

2.9.2 <u>Notice of Effective Date</u>. The Effective Date shall occur on the date on which all other preconditions to the Effective Date have occurred, and on which the Reorganized Debtor shall file with the Bankruptcy Court a notice of such Effective Date, and shall mail to all persons served with a copy of the Plan said notice informing such persons of: (i) the occurrence of the Effective Date, (ii) the deadlines established under this Plan for the filing of Administrative Expense Claims, and the Claims Objection Deadline, and (iii) such other matters as the Reorganized Debtor deems to be appropriate.

## ARTICLE 3
## DISCHARGE

### 3.1 Discharge

On the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code.

## ARTICLE 4
## GENERAL PROVISIONS.

### 4.1 Vesting of Property of the Estate.

Except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the Estate in the Reorganized Debtor, and (ii) after confirmation of the Plan, other than expressly provided for in the Plan, the property dealt with by the Plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the Debtor.

### 4.2 Binding Effect.

If the Plan is confirmed (subject to it becoming effective), the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

### 4.3 Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 4.4 Retention of Jurisdiction by the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction over the Bankruptcy Case, the Debtor, and the Reorganized Debtor with regard to the following matters:

(i)     to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan;

(ii)    to rule on any modification of the Plan proposed under section 1127;

(iii)   to hear and allow all applications for compensation to professionals and other Administrative Expenses and enter final orders;

(iv)    to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of executory contracts or unexpired leases; and

(v)     to adjudicate any Cause of Action which may exist in favor of the Debtor or Reorganized Debtor, as the case may be, including preference and fraudulent transfer causes of action.

**4.5 Captions.**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

### ARTICLE 5
### DEFINITIONS

5.1    The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan and they are supplemented by the following definitions:

"**Adversary Proceeding**" means the adversary proceeding related to the Bankruptcy Case and pending before the Bankruptcy Court styled *Panache Dev. & Constr., Inc. v. Romspen Mortg. Ltd. P'ship*, 24-01061 (Bankr. W.D. Tex.).

"**Administrative Expenses**" means the Claims identified in section 2.1(A) of the Plan including but not necessarily limited to the (i) Administrative Tax Claims; (ii) Debtor's counsel fees and expenses; (iii) other professional fees; (iv) Subchapter V Trustee fees; (v) RMLP's counsel fees incident to the DIP Claim; and (vi) the DIP Claim.

"**Administrative Tax Claims**" means the postpetition Claims for *ad valorem* taxes held by the relevant taxing authorities attaching on January 1, 2025, and January 1, 2026.

"**ACM**" means ACM Services, LLC, a domestic limited liability company duly organized and validly existing under the laws of the State of Texas.

"**ACM Disputed Secured Claim**" means the ACM Secured Claim filed in the Bankruptcy Case as Claim 8, over and above, $3,897.00 in amount.

"**ACM Undisputed Secured Claim**" means the ACM Secured Claim filed in the Bankruptcy Case as Claim 8, up to $3,897.00 in amount.

"**AFMN**" means AFMN Investments, LLC, a domestic limited liability company duly organized and existing under the laws of the State of Texas.

"**AFMN Third Lien Claim**" means the Claim held by AFMN evidenced by that certain *Promissory Note* by and between AFMN and the Debtor in a principal amount of $11,047,959.58, dated as of December 2, 2020, and acknowledged as of June 12, 2023.

"**Allowed Claim**" as it relates to any type of Claim provided for under this Plan, but excluding a Claim for Administrative Expenses, and not including any Disputed Claim, means a Claim:

    (i)    which has been scheduled as undisputed, noncontingent, and liquidated in the Schedules in an amount other than zero or unknown, and as to which:

        a.   no proof of Claim has been timely filed; and

        b.   no objection has been timely filed (as determined by applicable

deadlines contained in this Plan, including the Claims Objection Deadline);

    (ii)    as to which a proof of Claim has been timely filed and either:

        a.  no objection thereto has been timely filed (as determined by applicable deadlines contained in this Plan, including the Claims Objection Deadline); or

        b.  such Claim has been Allowed (but only to the extent allowed) by a Final Order of the Bankruptcy Court

    (iii)    which has been expressly Allowed under the provisions of this Plan; or

    (iv)    which has been expressly Allowed by Final Order of the Bankruptcy Court.

"**Austin CG**" means Austin CG Construction Services, Inc., a domestic for-profit corporation duly organized and validly existing under the laws of the State of Texas.

"**Austin CG Disputed Secured Claim**" means the Austin CG Secured Claim filed in the Bankruptcy Case as Claim 11, over and above, $168,000.00 in amount.

"**Austin CG Undisputed Secured Claim**" means the Austin CG Secured Claim filed in the Bankruptcy Case as Claim 11, up to $168,000.00 in amount.

"**Avoidance Actions**" means all Causes of Action in or pursuant to which property or the value thereof is or may be recoverable under sections 542, 553, 544, 545, 547, 548, 549, 550, 553, and/or 724(a) of the Bankruptcy Code or applicable non-bankruptcy law.

"**Ballot**" means each of the ballot forms for voting to accept or reject this Plan distributed to all holder of Claims entitled to vote on the Plan.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time, and also includes §§ 157, 158, 1334, 1408, 1412, and 1452 of title 28 of the United States Code to the extent applicable to the Bankruptcy Case.

"**Bankruptcy Case**" means the reorganization proceedings of the Debtor under Chapter 11 of the Bankruptcy Code, case number 24-10264.

"**Bid**" means a bid for the new membership interests of the Debtor at the Equity Auction.

"**Business Day**" means any day which is not a Saturday, Sunday, or a "legal holiday" within the meaning of Bankruptcy Rule 9006(a).

"**Cash**" means any legal tender of the United States of America.

"**Causes of Action**" means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether

known, unknown, contingent, non-contingent, matured, unmatured, suspected, unsuspected, liquidated, unliquidated, disputed, undisputed, Secured, unsecured, or assertable directly or derivatively, and whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include (i) Avoidance Actions; (ii) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (iii) the right to object to Claims or Interests; and (iv) any Claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

**"Claim"** means a claim against one or more of the Debtor, the Estate, and/or property of the Debtor or the Estate, as such term is otherwise defined in section 101(5) of the Bankruptcy Code, and arising at any time prior to the Effective Date, including claims first arising after the Petition Date, regardless of whether the same would otherwise be a claim under section 101(5) of the Bankruptcy Code.

**"Claims Bar Date"** means November 18, 2024, for all Claims, and March 8, 2025, for Claims of governmental units as that term is defined in section 101 of the Bankruptcy Code.

**"Claims Objection Deadline"** shall have the meaning ascribed to it in section 2.3.1 of the Plan.

**"Class"** means one of the categories of Claims and Equity Interests established under Article 2 of the Plan.

**"Closing"** means the consummation of the proposed Equity Purchase transaction.

**"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

**"Confirmation Hearing"** means the hearing(s) before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing(s) may be continued, rescheduled, or delayed.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code, as such order may be amended, modified, or supplemented.

**"Creditor"** means the holder of any Claim entitled to distributions under this Plan with respect to such Claim.

**"CRO"** means the Debtor's chief restructuring officer Greg Milligan.

**"Debtor"** or **"Debtor-in-Possession"** mean the debtor in this Bankruptcy Case, RIC (Austin) LLC, a domestic limited liability company duly organized and existing under the laws of the State of Texas.

**"DIP Claim"** means the Claim of RMLP approved by the Bankruptcy Court pursuant to

the *Debtor's Motion for Entry of an Order (I) Authorizing Debtor to (A) Obtain Senior Secured Superpriority Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expenses Status, (C) Use Cash Collateral, and (D) Grant Adequate Protection; and (II) Granting Related Relief* [Docket No. 111] and any order thereon.

"**Disputed Claim**" means any Claim to which the Debtor objects prior to the Claims Objection Deadline.

"**Disbursing Agent**" means the Reorganized Debtor.

"**Effective Date**" means, provided that Closing has occurred, the first Business Day that is fourteen (14) days after the date that the clerk of the Bankruptcy Court enters the Confirmation Order if the Confirmation Order is not stayed; or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay that is at least fourteen (14) days after the clerk of the Bankruptcy Court enters the Confirmation Order, and upon which the conditions to the effectiveness of the Plan set forth in section 2.9 hereof are satisfied.

"**Equity Auction**" means the auction of the new membership interests to be issued under the Plan as detailed in Article 2 of the Plan.

"**Equity Auction Proceeds**" mean the proceeds of the Equity Auction paid by the Successful Bidder for the Debtor's Equity Interests in the amount of the Successful Bid.

"**Equity Interest**" means parties-in-interest who hold an ownership interest in the Debtor subject to any ongoing litigation.

"**Equity Purchaser**" means the Successful Bidder at the Equity Auction.

"**Estate**" means the Debtor's estate created pursuant to section 541 of the Bankruptcy Code, and any other applicable provision thereof.

"**Final Order**" means a judgment, order, ruling, or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which judgment, order, ruling, or other decree has not been reversed, stayed, modified, or amended and as to which:

(i)     the time to appeal or petition for review, rehearing, or certiorari has expired and as to which no appeal or petition for review, rehearing, or certiorari is pending; or

(ii)    any appeal or petition for review, rehearing, or certiorari has been finally decided and no further appeal or petition for review, rehearing, or certiorari can be taken or granted.

"**Insider**" means an insider of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

25

"**Outside Closing Date**" means the fifth (5) Business Day following the date of the entry of the Confirmation Order.

"**Panache**" means Panache Development & Construction, Inc., a domestic for-profit corporation, duly organized and validly existing under the laws of the State of Texas.

"**Panache Fourth Lien Claim**" means the Claim of Panache evidenced by proof of Claim 5 in the Bankruptcy Case.

"**Plan**" or "**Plan of Reorganization**" means this *Debtor's Combined Second Amended Plan and Disclosure Statement,* either in its present form, or as it may be altered, amended, or modified from time to time.

"**Priority Tax Claim**" means a Claim for income, employment, or other taxes described and identified by § 507(a)(8) of the Bankruptcy Code.

"**Property**" means, where capitalized, that certain 110-acre real property, together with all improvements, fixtures, and personal property thereon, located at 3443 Ed Bluestein Boulevard, Austin, Texas 78721.

"**Qualified Bid**" has the meaning ascribed to it in section 2.5.2.5 of the Plan.

"**Qualified Bidder**" has the meaning ascribed to it in section 2.5.2.5 of the Plan.

"**Reomaster**" means Romspen (Reomaster) Holdings Inc., a foreign for-profit corporation, duly organized and existing under the laws of the State of Delaware, or its assignee or affiliate as designated by Romspen (Reomaster) Holdings Inc.

"**Reorganized Debtor**" means the Debtor on or after the Effective Date.

"**RMLP**" means Romspen Mortgage Limited Partnership, a foreign limited partnership, duly organized and existing under the laws of Ontario.

"**RMLP First Lien Claim**" means the Claim of RMLP evidenced by proof of Claim 6 in the Bankruptcy Case, as amended pursuant to the *Debtor's Motion for Entry of an Order (I) Authorizing Debtor to (A) Obtain Senior Secured Superpriority Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral, and (D) Grant Adequate Protection; and (II) Granting Related Relief* [Docket No. 111].

"**RMLP Second Lien Claim**" means the Claim of RMLP evidenced by proof of Claim 7, as amended, in the Bankruptcy Case.

"**Secured**" means, when referring to a Claim: (a) secured by a lien on property in which the Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interests in the Estate's interest in such property or to the extent of the amount subject to setoff, as

26

applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

"**Secured Claim**" means a Claim that is Secured.

"**Segregated Funds**" shall have the meaning ascribed to it in section 2.2(A) Class 5 subsection (d) of the Plan.

"**Stalking Horse Bid**" has the meaning ascribed to it in section 2.5.2.3 of the Plan.

"**Stalking Horse Purchaser**" means Reomaster, or its assignee.

"**Subchapter V Trustee**" means the subchapter V trustee in this Bankruptcy Case, Eric Terry.

"**Successful Bid**" means the highest and best Bid for the new membership interests at the Equity Auction, as determined in the reasonable discretion of the CRO and without undue discrimination.

"**Successful Bidder**" means the Qualified Bidder, or the Stalking Horse Purchaser whatever the case may be, selected as having the highest and best Bid for the new membership interests of the Debtor at the Equity Auction.

"**Summer Legacy**" means Summer Legacy, LLC, a domestic limited liability company duly organized and validly existing under the laws of the State of Texas.

"**Summer Legacy Disputed Secured Claim**" means the Summer Legacy Secured Claim filed in the Bankruptcy Case as Claim 14, over and above, $149,857.65 in amount.

"**Summer Legacy Undisputed Secured Claim**" means the Summer Legacy Secured Claim filed in the Bankruptcy Case as Claim 14, up to $149,857.65 in amount.

"**Texas Air**" means Texas Air Industries, Inc., a domestic corporation duly organized and validly existing under the laws of the State of Texas.

"**Travis County Secured Claim**" means the disputed Claim of the Travis County taxing authority for disputed 2024 *ad valorem* taxing liability of the Debtor.

"**Unsecured Claim**" means any Claim that is not a Secured Claim.

27

Respectfully submitted,

By: */s/ Greg Milligan*
    Greg Milligan
    Chief Restructuring Officer
    RIC (Austin), LLC

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Thomas D. Berghman*
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    Jay H. Ong
    Texas Bar No. 24028756
    1717 West 6th Street, Suite 250
    Austin, Texas 78703
    Telephone:  (512) 391-6100
    Facsimile:  (512) 391-6149
    E-mail:  tberghman@munsch.com
            jong@munsch.com

*Counsel for RIC (Austin), LLC*